**BENDER et al. v. CRUCIBLE STEEL CO. OF AMERICA.**

Civil Action No. 4244.

District Court, W. D. Pennsylvania.

April 30, 1947.

A. M. Oliver, of Pittsburgh, Pa., for plaintiffs.

Reed, Smith, Shaw & McClay, of Pittsburgh, Pa., for defendant.

GIBSON, District Judge.

The court, after hearing and consideration, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

1. Crucible Steel Company of America (hereinafter called "the Company") is a corporation organized and doing business in the Commonwealth of Pennsylvania, and operates a specialty steel plant in the City of Pittsburgh, Allegeny County, Pennsylvania, at Ridge Avenue and Reedsdale Street, known as the "LaBelle Works," the principal business of which is the manufacture of various sizes and shapes of specialty steels for the agricultural implement industry.

2. In the process of manufacturing specialty steels in various sizes and shapes, the Company has established at the LaBelle works various production departments, some of which contain subdivisions or units, and a number of service or maintenance departments, each of which departments, subdivisions and units had distinct and separate operating or service functions.

3. Each of the aforesaid departments, subdivisions and units had been regularly and customarily recognized as such for a great many years, in most cases since prior to World War 1.

4. During the periods hereinafter stated, the plaintiffs were department foremen, shift foremen or assistant foremen in various departments, subdivisions and units, and had as their primary duty the management of a particular department on all shifts or one shift or of a particular subdivision or unit of a department on all shifts or one shift, as follows:

#### Hammers

Tonn—Assistant Foreman—April 26, 1942, to September 30, 1945.

#### Rolling Mills

Loughren—Shift Foreman—May 1, 1939, to September 30, 1945.

Boylan—Assistant Foreman—December 15, 1940, to Sept. 30, 1945.

Follen—Shift Foreman-9″ Mill—January 11, 1942, to June 16, 1945.

Gitschier—Shift Foreman-9″ Mill—May 1, 1939, to September 30, 1945.

James Rheam—Shift Foreman-9″ Mill, 16″ Mill, 10″ Mill—May 1, 1939, to September 30, 1945.

Samuel Rheam—Shift Foreman-16″ Mill —May 1, 1939, to September 30, 1945.

#### Shear Shipping

Gillespie—Shift Foreman—December 7, 1941, to September 30, 1945.

#### Shear Shop

Short—Department Foreman—May 1, 1939, to September 30, 1945.

#### Plow Mill and Disk

Bender—Shift Foreman—May 1, 1939, to April 30, 1941, Department Foreman—May 1, 1941, to September 30, 1945.

#### Disk

Dempster—Shift Foreman—April 16, 1944, to September 30, 1945.

Wise—Department Foreman—May 1, 1939, to August 15, 1944.

Jacuk—Shift Foreman—October 1, 1939, to August 15, 1944, Department Foreman—August 15, 1944, to September 30, 1945.

#### Warehouse

Costa—Shift Foreman—May 1, 1939, to September 30, 1945.

DeChar—Shift Foreman—April 1, 1941, to September 30, 1945.

Morgan—Shift Foreman—June 16, 1944, to September 30, 1945.

#### Heat Treating

Giovenco—Department Foreman—May 1, 1939, to September 30, 1945.

Tock—Assistant Foreman—October 1, 1939, to September 30, 1945.

#### Conditioning and Chipping

Kress—Shift Foreman—May 1, 1939, to September 30, 1945.

Grannis—Assistant Foreman—June 1, 1941, to April 24, 1944.

#### Labor

McClurg—Department Foreman—May 1, 1939, to September 30, 1945.

Neenan—Assistant Foreman—June 1, 1941, to September 30, 1945.

#### Boiler

Doran—Shift Foreman—May 1, 1939, to September 30, 1945.

Heath—Shift Foreman—May. 1, 1939, to September 30, 1945.

Reed—Shift Foreman—May 1, 1939, to September 30, 1945.

Blacksmiths

Doerr—Department Foreman—May 1, 1939, to September 30, 1945.

Machinists

Harris—Department Foreman—May 1, 1939, to September 30, 1945.

Electricians

Muller—Department Foreman—May 1, 1939, to September 30, 1945.

Millwrights

Martin—Assistant Foreman—May 1, 1939, to January 1, 1941, Department Foreman—August 1, 1941, to September 30, 1945.

Night · Operations—LaBelle Plant

Sklopan—Shift Foreman—May 1, 1941, to September 30, 1945.

5. During the foregoing periods of time, each of the plaintiffs customarily and regularly directed the work of other employees in the department or subdivision named.

6. During the foregoing periods of time the plaintiffs had the authority to hire other employees and their suggestions and recommendations as to hiring and firing of other employees were given particular weight.

7. During the foregoing periods of time, the suggestions and recommendations of the plaintiffs as to the advancement and promotion of other employees were given particular weight.

8. During the foregoing periods of time, the suggestions and recommendations of the plaintiffs as to other changes of status of other employees were given particular weight.

9. During the foregoing periods of time, each of the plaintiffs customarily and regularly exercised discretionary powers.

10. During the foregoing periods of time each of the plaintiffs was paid either on a monthly salary basis which exceeded $30 per week, or on an hourly or turn basis, which prior to December 14, 1940, resulted in their receiving and taking home a minimum of $30 per week, and after December 14, 1940, was supplemented by a guarantee that, in any workweek in which they worked, they would receive not less than $30.

11. During the foregoing periods of time, none of the plaintiffs performed work of the same nature as that performed by non-exempt employees for hours exceeding 20% of the number of hours worked in the workweek by the non-exempt employees under the plaintiffs' direction.

12. The foregoing periods of time are the only periods of time material to this case and at all other times between May 1, 1939, and September 30, 1945, the plaintiffs were nonexempt and were paid overtime under the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

13. During certain periods of time in issue in this case, each of the plaintiffs was paid additional compensation under a War Bonus plan in lieu of overtime, approved by the Treasury Department under the Economic Stabilization Act of 1942, 50 U.S.C. A.Appendix, § 961 et seq., said periods of time being set forth correctly and in detail in Defendant's Exhibit 1.

14. Prior to October 24, 1940, William Bender was compensated on a monthly salary basis in excess of $30 per week and subsequent to October 24, 1940, was compensated at a monthly salary rate in excess of $200 per month.

15. From May 1, 1939, to September 30, 1945, William Bender regularly and directly assisted a bona fide executive employee, his duties being non-manual in nature and requiring discretion and independent judgment.

16. All of the plaintiffs worked overtime hours during certain of the workweeks in the period of time involved without being compensated therefor at the rate of time and one-half for such overtime hours.

17. A normal workweek at defendant's "LaBelle Works" until July 1, 1943, was forty (40) hours per week.

18. A normal workweek from July 1, 1943, until the end of the period was forty-eight (48) hours per week.

19. All of the plaintiffs were employed in the production of goods for interstate commerce.

Conclusions of Law

I. This court has jurisdiction of the subject matter of and the parties to this action pursuant to the provisions of Section

17 of the Fair Labor Standards Act of 1938.

II. During the periods of time in issue in this case all of the plaintiffs were executives, as such term is defined and delimited by regulations of the Administrator, and as stated in Section 13(a) of the Fair Labor Standards Act of 1938.

III. During the period of time in issue in the case of William Bender, said plaintiff was an administrative employee, as such term is defined and delimited by regulations of the Administrator, and as stated in Section 13(a) of the Fair Labor Standards Act of 1938.

IV. During the periods of time in issue in this case the plaintiffs were not entitled to overtime under Sections 6 and 7 of the Fair Labor Standards Act of 1938.

V. If plaintiffs, or any of them, had been entitled to overtime under Sections 6 and 7 of the Fair Labor Standards Act of 1938, during any period of time when War Bonus payments were effective, either on a current or retroactive basis, defendant would have been entitled to credit against any payments required to be made under the Act, for amounts paid as War Bonus.

VI. The Complaint should be dismissed.

VII. Said defendant is entitled to costs.

### Discussion

The thirty complainants herein have brought their action under the Fair Labor Standards Act of 1938, claiming overtime pay, liquidated damages and attorney's fees.

Complainants are foremen in various subdivisions of the LaBelle Works of the Crucible Steel Company. The defendant alleges that each of them, under Section 13(a) of the Act and the Regulations adopted thereunder, is an executive employee and as such exempt from the overtime provisions of the Act. It is admitted that plaintiffs were engaged in interstate commerce, and that they occasionally worked hours which would require payment of overtime if they were not exempt.

The LaBelle Works manufactured a large number of different grades of steel, one of its principal industries being the manufacture of agricultural implements. It had nine production departments, which were subdivided, and seven service departments. The production departments were described and known as Crucible, Hammer Shop, Rolling Mills, Plow Mill, Disk, Warehouse, Heat Treating, Conditioning and Chipping and Labor. The seven service departments were Boilers, Blacksmiths, Machinists, Electricians, Millwrights, Roll Turners and Stores. The locations of the various departments and units of the plant appeared in the testimony.

None of the plaintiffs were in the Crucible Department.

The function of the Hammer Department was a forging operation by which billets were reduced in size to smaller forgings of various types. In it were a seven-ton cogging hammer, a four-ton finishing hammer, and three others of somewhat less size. It had for many years been an established department of the plant.

The Rolling Mills Department functioned as rolling mills ordinarily do. It will be noted that the mills of the plant produced some irregular shapes which were not produced elsewhere. It contained a 20-inch cogging mill, a 16-inch bar mill, two 10-inch guide mills, a 9-inch guide mill, and a 14-inch bar mill. Each of the six mills was a unit and was operated by a foreman, or head roller, having about thirteen men to the crew. The department employed about eighty men in each shift.

Two Plow Mills constituted the Plow Mill Department, one being a 24-inch plate mill and the other a 20-inch mill. The function of these mills was to roll billets into finished plate to be processed in other departments in the agricultural and steel section. Each mill has its row of shears to shape the plates as desired. A shipping department is a part of the function of the Plow Mills.

The Disk Department produced concave agricultural disks. It contained forming hammers, heat treating furnaces, quenching tanks, drawing furnaces, grinders and other finishing equipment. About 78 employees were in this department.

The Warehouse Department straightened and inspected and prepared manufactured products for shipment. It had scales, overhead cranes, some trucks, grinding machines and marking devices.

Some orders which were rolled or hammered in other departments required heat treating and annealing, and these were the functions of the Heat Treating Department. It had annealing and heat treating furnaces, quenching tanks, overhead cranes, etc. About 16 to 20 employees were engaged in this department.

The Conditioning and Chipping Department, divided into two parts, had for its purpose the conditioning of the steel for further processing.

The Labor Department had many duties. It cleaned up the plant, removed ashes from the heating furnaces, operated trucks which delivered material to and from the plant, loaded and unloaded cars, and delivered coal to the boiler house and treating furnaces. From it was drawn a labor pool for use of the other departments.

The service departments concerned in this action are five, the Boiler, Blacksmith, Machinists, Electricians and Millwrights Departments.

The mills and hammers were powered by steam from six boilers, which had the auxiliary tools required to operate them. The Blacksmiths made all the tools for the plant. The Machinists repaired and serviced all the machines, and the Electric Department functioned along the expected and readily understood lines in a plant such as the LaBelle Works; and likewise the Millwrights kept the machinery going.

The plaintiffs are all foremen, but some have been termed department foremen, others as shift foremen, and still others as assistant foremen. The department foremen had general charge of departments but in reality differed but little in function from the shift foremen, as each had charge and independent control of the men in a shift. Those termed as assistant foremen had approximately the same functions and authority as the department foremen, but usually served in a separated unit of a department. As to assistant foremen the Stein Report, which has been adopted by the Administrator of the Wage and Hour Division in redefining, inter alia, the regulations relating to exemption of executive employees, says:

"On the other hand it is incorrect to assume that, in a large department the super-vision cannot be distributed among two or three employees, conceivably among more. In such instances, assuming that the other tests are met, especially the one concerning the performance of non-exempt work, each such employee should be held to be one 'who customarily and regularly directs the work of other employees therein.' It is not thought that any change in the wording of section 541.1 is needed to enforce this point."

■ The first test of an exempt executive employee, as prescribed by the Amended Regulations, is fulfilled by the foremen in the LaBelle Works. Each has charge of employees "of a customarily recognized department or subdivision" of the Works. These subdivisions had been established for many years. In adding the "subdivision" to the original Regulations the Stein Report says:

"The present Regulations do not denote a specific type of unit by the use of the word 'department' but contemplate the continuing functioning of the unit and the customary recognition of the functioning unit as such. This is merely made clear in the proposed alteration."

In applying the tests of Regulations, Part 541, as amended, to the plaintiffs, it seems plain that they are persons who "customarily and regularly directed the work of other employees in their department or subdivision."

The Stein Report is quoted:

"The present definition of the terms 'executive' and 'administrative' applies with particular aptness to persons who are commonly called 'bosses'. The range of exemption is broad. It extends from the president of a large and complex corporate structure down to the foreman in charge of a very minor department."

■ Each of the plaintiffs, possibly excepting William Bender, who perhaps also properly qualifies as an administrative employee, was a "boss" under this definition in a subdivision of the LaBelle Works. The plaintiffs who testified admitted reluctantly that they directed the fellow-employees in their shift.

The second test of executive employees has also been substantially met. True, in

all large modern plants employees are not usually hired by foremen, or even by high executive officers. That is usually done by an employment department. In this case, in several instances, recommendation of a foreman led to employment. After the employee had been approved by the employment director his name was still submitted to the foreman who had the power to reject him. As to the right to discharge an employee, while the right was seldom exercised and, owing to shortage of employees the ordinary method was to submit the recommendation to a higher executive, it was exercised several times. Certainly the recommendation of the foreman as to hiring and firing and as to promotion or otherwise of employees was given particular weight. Some of the plaintiffs, albeit somewhat reluctantly, admitted that they had recommended advancement in rates of payment to employees which had been approved by higher executives or administratives.

The fourth test of an exempt executive employee, prescribed by the Regulations, is found in the provision that he is one "who customarily and regularly exercises discretionary powers * * *."

The testimony of a number of the plaintiffs, if it were alleged to be evasive, would convict one who so described it of understatement. In fact all of the plaintiffs who testified denied that they had any discretionary power in the exercise of their authority as "bosses." Some of them even denied any discretion when faced with their written exercise of such powers. Their attitude was doubtless due to a misconception of what constituted "discretionary power." On their examination their counsel put to them such questions, in substance, as: Did you have control of the operation of the LaBelle Works? And did you have control of the operation of the (specified) department of the LaBelle Works? In reply to such questions the natural answer was a negative. From time to time it developed, however, that plaintiffs were not without discretionary power. For example, when employees had a grievance or complaint, or a request for increase in wages, they were required to present it first to their foreman. In writing he either approved or disapproved the employees' contention. It then went to the higher executive officers, who always considered the ruling of the foreman, occasionally approving and at times disapproving his recommendations. The foreman, when a doubt arose as to the rejection or approval of a partly completed article, had the power to determine whether it should be rejected or an attempt should be made to perfect it. Also, the foreman could determine whether or not material, alleged to be of no use to the company, could be removed from the plant. He also gave permission to employees to leave the Works prior to the end of the shift, and approved or disapproved of resignation from service of the defendant. Each foreman was responsible for safety requirements in his section.

No question exists as to the next test of exemption. Each foreman was compensated for his services at more than $30 per week.

As usual in cases in this type under the Fair Labor Standards Act, the testimony varied widely in respect to the last test laid down in the amended Regulations. The plaintiffs who testified each declared that he had performed work of the same nature as that performed by nonexempt employees in excess of 20% of the number of hours worked by the nonexempt employees under their direction. This testimony was by no means satisfying. The plaintiffs were interpreting the Regulations in accordance with their desires rather than from a consideration of their actual duties. The foremen were specially skilled men, and as such required to instruct the employees under them. If in the course of such instruction it became necessary to operate a machine for a time while the employee viewed and learned the operation, the foreman in the operation was doing what his appointment required and was not doing nonexempt work. In the special opinion, issued September 4, 1941, Administrator Fleming said in part:

"The operation of a machine under such circumstances, while the employee being instructed watches the operation, is an es-

sential part of the supervisory duties and is exempt work."

Some of the foremen included in the nonexempt work claimed by them the clerical work they performed in maintaining production and personnel records and making reports in connection with their particular department. Such work was clearly a part of supervisory duty, although resembling the duty of a bookkeeper. See the Stein Report. Of the same nature was work necessary in the inspection and testing of the work of employees under supervision. Even when a foreman, in an emergency, temporarily aided an employee in the LaBelle Works in his job, such aid was not nonexempt work. This was admitted by the plaintiff Muller. In a grievance form, promoted by the union upon complaint that Lambert, Muller's superior officer, had prepared an ash hoist, Muller stated that it was the duty of a superintendent or foreman, in an emergency, to take whatever steps were necessary to overcome the difficulty. In this grievance form Muller stated that neither he nor Lambert did more than 20% of nonexempt work. He testified to the contrary upon trial.

As against the testimony of the plaintiffs the officers of the defendant company denied the testimony as to nonexempt work by foremen. This was after their testimony as to their opportunities to observe their functioning.

The superintendent of the plant testified that he had specially warned foremen to avoid nonexempt work, as he feared trouble from the union in event of any complaint along that line.

The testimony of the officers of the LaBelle Works appeared to the court to be less colored by interest than was that of the plaintiffs in respect to nonexempt work, and has satisfied it that the foreman, except in a possible temporary emergency, had performed no nonexempt work, and had not regularly performed it in excess of the 20% limit.

Finding, as does the court, that the foremen plaintiffs were exempt employees under the Regulations of the Administrator, judgment will be ordered in favor of defendant.