**JONES v. BETHLEHEM–FAIRFIELD SHIPYARD, Inc.**

Civ. A. No. 3006.

District Court, D. Maryland.
Dec. 22, 1947.

Marbury, Miller & Evans, Wm. L. Marbury and Charles C. G. Evans, all of Baltimore, Md., for defendant.

CHESNUT, District Judge.

The plaintiff in this case has sued to recover additional compensation for overtime work in accordance with the Fair Labor Standards Act, 29 U.S.C.A. § 216(b). The principal defense is that the plaintiff was in an exempt class under section 213(a), which provides in part "The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide *executive, administrative,* professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)." Italics supplied.

The defendant contends that the plaintiff was employed in an executive or administrative capacity. In 1940 the Administrator published regulations defining the terms executive and administrative capacity which are set out in the margin.[1]

W. LeRoy Ortel and Edwin S. Panetti, both of Baltimore, Md., for plaintiff.

The case has been heard upon the complaint, answer, evidence and arguments of

---

[1] "Section 541.1—Executive.

"The term 'employee employed in a bona fide executive * * * capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) Whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(B) who customarily and regularly directs the work of other employees therein, and

"(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(D) who *customarily and regularly exercises discretionary powers,* and

"(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the *workweek* by the nonexempt employee under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

"Section 541.2—Administrative.

"The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

"(B1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is *nonmanual* in nature *and requires the exercise of discretion and independent judgment;* or

"(2) who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or

counsel. From the evidence the court makes the following findings of fact.

## Findings of Fact

The Bethlehem-Fairfield Shipyard, Inc., was a subsidiary of the Bethlehem Steel Company organized and operated shortly before and during the last war, for the purpose of building ships (largely Liberty Ships) for the United States Maritime Commission. It acquired and operated several plants in and about the Fairfield-Curtis Bay area of the Baltimore City Harbor. The several plants occupied about 244 acres of ground with numerous buildings and shipways, including a fabricating plant of 41 acres and the shipbuilding plant of 138 acres. It employed about 45,000 employees, men and women. It operated three suits of employees each on an eight-hour basis, but many employees worked more than 40 hours a week. A great majority of all its employees were paid for overtime work in accordance with the Act.

For the preservation of order on the premises and to facilitate the smooth and proper operation of this very large war industry, the management of the Company found it necessary to organize a separate department known as the Guard Department consisting of 500 to 600 employees. This was set up on military lines and the several employees in this department were classified as (1) private guards; (2) corporals; (3) sergeants; (4) lieutenants; (5) captains, all under an official known as the Chief of Police. This whole police force was organized into six companies, three for the fabricating and three for the shipbuilding plant, the employees at each working on eight-hour shifts.

The guard department was in turn a part of a somewhat larger department known as the Plant Protection Department, consisting of private police and firemen, both departments responsible to the Chief of Plant Protection Department, the function of which was to protect the shipyard from crime, disorder and sabotage and to be on the alert for fires or any other danger. During a substantial portion of the period in suit the members of the guard department were also made auxillary members of the Coast Guard.

In general, the privates of the guard department patrolled posts assigned to them by their superiors, attended at the several gates where the large number of employees on different shifts from time to time entered the plant, to see that the time clocks were properly punched, and operated as a protective force in any emergency or unlawful disturbance affecting the shipyard. They also performed other related police duties such as the direction of traffic and control of the gates where persons and vehicles entered or left the plant.

A corporal of the guard had charge of a limited section of private guards, usually about six to nine in number, and was in turn subordinate to a sergeant responsible for a number of sections. The duties of the sergeants were to supervise the work of private guards and corporals. There were at each of the several plants only one or two sergeants for each shift. The sergeants made regular tours of the whole plant generally about two a day for each shift. The sergeants had the power to reprimand guards for neglect of duty and to suspend or discharge them subject to the approval of other officers. In performing these duties they necessarily had to exercise judgment and discretion in applying the rules of the management of the plant. If occasion demanded, the sergeant could, of course, and at times did make arrests of disorderly employees or others on the premises. When the private guards were stationed at the gates or clock houses their respective sergeants would oversee the performance of their duties.

The privates and corporals were classified as nonexempt employees under the Act; while the sergeants and lieutenants, captains and Chief of Police were classified as exempt employees under section 13 of the Act.

---

knowledge, and *which requires the exercise of discretion and independent judgment;* or

"(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations *involving the exercise of discretion and independent judgment.*" (Italics supplied.)

The duties of the sergeants and Lieutenants of the guard department required that they exercise judgment and discretion. They customarily supervised and directed the work of the privates and corporals. They had authority to make recommendations to their superiors in respect to the hours and operation and work of the guard department and the status of their subordinates and they did make such recommendations. Their recommendations related to such matters as augmenting the size of the force, the promotion or demotion of individual members of the force, increases in their pay and the like. They reprimanded the guards under them when they deemed a reprimand sufficient disciplinary action for improper performance of duties. When they considered more drastic disciplinary action necessary, they recommended suspension or discharge, dependent upon the nature of the offense. Their recommendations were given particular weight, and, as a general rule, were followed.

There was but one Lieutenant for each shift of the guard. A Lieutenant had much the same general duties and authority as a sergeant but was in a higher grade. He ordinarily made but one tour of the whole shipyard in a day and at other times was stationed in the guard house in the plant. His duties were the general supervision of the guard force, and to enforce discipline and to see that orders were carried out. He had the power to and did frequently recommend promotions in the guard force, and made recommendations as to increases in compensation.

As in many large industrial plants, the actual hiring of all employees in all departments was made only by the employment department of the industry. The officers of the guard department, the sergeants, Lieutenants and Captains, held meetings from time to time for consideration and discussion and instruction in the carrying out of their duties. Minutes of these meetings were kept. All of them exercised discretion and judgment in carrying out orders for the day in the discharge of their duties. These orders were generally given at the beginning of the operation of the particular shift by the Captain of the guard, and might thereafter be transmitted orally from the Lieutenants to the sergeants or by the sergeants to the corporals and private guards.

Mr. Charles F. Hertig, long an employee of the Bethlehem Steel Company, was superintendent of the whole Plant Protection Department of the defendant corporation. He testified at length with respect to the organization and setup of the guard department and the duties, responsibilities and authority of the respective officers, Captains, Lieutenants and Sergeants. In general, I have accepted as correct his evidence on this subject. It was supported in many instances by the production of documentary evidence. Indeed the factual evidence given by the plaintiff himself is not materially different from the testimony of Mr. Hertig, varying from it chiefly in matters more of opinion than of fact.

The plaintiff was first employed as a private guard in September 1941, promoted to be a sergeant in February 1942, and again promoted in December 1943 to be a Lieutenant, in which latter capacity he served until January 31, 1946. As a private guard he was paid on an hourly basis and for all overtime work in accordance with the Act. No claim is made for extra compensation for services in that classification. When he was promoted to be a sergeant he was paid a salary at the rate of about $253 per month, and when promoted to be a Lieutenant at the rate of $278 per month. No deductions were made from this salary for temporary absences for sickness, or vacations of two weeks a year. His compensation when a private guard amounted on an hourly basis to about $45 a week. The present suit was not instituted until April 9, 1946. While the plaintiff was employed as a sergeant he was generally stationed at the fabricating shop where he was the only sergeant for the shift, and supervised approximately 40 privates and the corporals who were in direct charge of these men. For some part of his services as sergeant he was stationed at the shipyards where the supervision of 120 privates and corporals was divided between him and one other sergeant.

The primary duty of the plaintiff Jones as a sergeant and as a Lieutenant in the guard department was to manage a recognized subdivision of that department and he customarily regulated and directed the work of

his subordinates therein. He had the authority to recommend that his subordinates be reprimanded or discharged or promoted, or their pay increased. His recommendations were given particular weight by his superior. He made recommendations with respect to suspension and he customarily and regularly exercised judgment and discretion in the performance of his duties. Both as sergeant and Lieutenant his duties differed from those of subordinate members of the guard department. While he occasionally made arrests and performed other acts which might have been performed by a subordinate, if a subordinate had been present, that did not deprive his activity of its supervisory character. Such particular acts were incidental to his main employment as a supervisor. As Lieutenant the plaintiff was a company commander in charge of one or the other of the companies on various shifts either at the shipyard or the fabricating shop. In his complaint he claims that as he was employed generally six days a week at nine hours a day, or 54 hours a week, he should receive compensation in addition to the salary that he received at the rate of time and a half for the alleged overtime of 14 hours a week from February 1942 to January 31, 1946, or in the aggregate amount, according to his estimate, of about $1,500.

■ In summary, I find that the classification of the plaintiff as an exempt employee under the Act was proper and in accordance with the several requirements of the definition of the term "executive or administrative capacity" as contained in the regulations made by the Administrator.

The defendant has also, by an amended answer, raised the defense that its activities were not in interstate commerce and that its employees were not within the scope of the Fair Labor Standards Act because they, including the plaintiff, were not engaged in interstate commerce or in the production of goods for commerce. I find it unnecessary in this case to decide this point; but from the evidence bearing on it, I find the following facts.

The defendant, Bethlehem-Fairfield Shipyard, Inc., was formed in the early part of 1941 for the purpose of building ships for the United States Government. During the period from 1941 until shortly after the end of the war, the defendant was engaged at Fairfield, Maryland, in the construction, assembly, and outfitting of 384 Liberty Ships, 94 Victory Ships, and 30 L.S.T.s (Landing Ship Tanks), pursuant to contracts with the United States Maritime Commission. All of these vessels were delivered to the Commission at Fairfield, Maryland. The L. S.T.'s were turned over by the Commission to the United States Navy, and the Liberty and Victory Ships were used in the prosecution of the war by agencies of our Government and the British Government. Approximately 90% of the materials used in the construction of the ships was supplied by the Maritime Commission. The contracts which were executed by the defendant and the Commission prior to April 1, 1945, provided that the ships should be paid for on a cost-plus-fixed-fee basis. The contracts executed on and after April 1, 1945, provided for the construction and delivery of ships on a lump sum basis. All work performed by the defendant was performed for the Maritime Commission.

The vessels were constructed on lands either leased by Bethlehem-Fairfield at the request of the Maritime Commission or on land owned by the United States Government. Bethlehem-Fairfield was reimbursed by the Maritime Commission for the rentals paid by it to the owners of the various parcels of leased land. The shipways and other facilities used in the construction of the ships were built by Bethlehem-Fairfield at the expense of the Commission and title to the facilities was vested in the Commission. The ship construction contracts provided that title to all vessels and to all materials, equipment, supplies, and all other property assembled at the site of the facilities or elsewhere for the purpose of being used for the construction of the vessels, as well as title to any material, machinery, or equipment ordered for use in connection with the performance of the work under the contracts to the extent that the Maritime Commission or the Company made payment therefor, even though delivery thereof had not been made, should vest in the Commission. At Curtis Bay, Maryland, there was located a fabricating shop in which numerous units

were assembled and thereafter transported by truck or railroad to the shipyard at Fairfield. The defendant was one of the largest employers of labor in Maryland during the war and at the peak of production employed approximately 45,000 employees.

I conclude as a matter of law that the plaintiff is not entitled to additional compensation for alleged overtime work and the complaint must be dismissed. The issue in the case is one of fact rather than of law. The latter has been well established in numerous prior decisions. The Act is to be liberally construed and enforced in cases where the facts justify its application. Where, as in this case, the defense is that the employees were exempt under section 13 of the Act, the burden is on the defendant to show that the plaintiff employee was properly classified as exempt in accordance with the conjunctive paragraphs of the definition of "executive or administrative" contained in the regulations. Walling, Wage & Hour Administrator, v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883. The applicable legal principles have also been considered at some length in the opinion of this court in the case of Aulen v. Triumph Explosive, D.C., 58 F.Supp. 4, dealing with the exempt status of "professional" employees. It is unnecessary to repeat here what was there said.

Nor do I think it necessary to greatly extend this opinion by discussing separately the applicability of the facts to each of the several conjunctive elements of the regulatory definition, as I think that will sufficiently appear from the stated facts. It is also reasonable to bear in mind that the administrative definition was necessarily phrased in general language to cover a great variety of different factual situations. Doubtless the main purpose of the definition was to avoid evasion of the statute by merely colorable titles given to employees by nominal classifications having no substantial basis in reality. In applying the definition we must look to substance rather than form. While all the several elements of the definition must be substantially met, it has been recognized both administratively and approved judicially that the weightiest test is the amount of compensation paid by the employer. While this is, of course, not of itself sufficient and not conclusive, it is a very strong factor in determining the good faith and reasonableness of the classification as made by the employer.

Each of these cases must depend upon its own particular facts. In the instant case, we are dealing with a very particular situation, that of a wartime corporation for the building of ships vitally necessary for the national defense requiring speed in production and very rapid expansion of plant and number of employees, the latter operating in three shifts twenty-four hours a day, largely for seven days a week. The case is, of course, vastly different in nature from that of a small industrial plant operating in peace time. Obviously, for efficiency in production and avoidance of interruption to the orderly progress of the work, the 45,000 employees were necessarily divided into numerous departments with different classifications.

The classification of exempt and nonexempt employees was early made in the latter part of 1941, and was continuously maintained thereafter until 1946. The propriety and legality of the classifications so made and continued was never questioned by the employees of any class or by any official authority (as, for instance, the Administrator of the Act) until after the war work was completed. The plaintiff was originally employed as a private guard and compensated on an hourly basis for time and overtime in accordance with the Act. In that capacity he averaged about $45 a week. He voluntarily accepted, without objection, a promotion to be a sergeant and later to be a Lieutenant in the guard department with very substantially increased compensation, and change in basis of compensation from hourly pay to monthly salary. He made no complaint of his classification until more than four years later when this suit was filed. While the delay in bringing the suit does not constitute an estoppel and subjects the plaintiff only to the applicable period of limitations (three years in this case, see Roland Electrical Co. v. Black, 4 Cir., 163 F.2d 417), it indicates that he did not originally consider that his rights under the Act were being disregarded by the defendant, as he now contends. This change in position nat-

urally requires careful appraisal of his present testimony to the extent that it constitutes an expression of personal opinion rather than statement of fact.

The classification of the employees in the guard department was proposed by Melvin G. Hodgkinson, a witness in the case, and subsequently specifically approved and put into effect by the defendant. Mr. Hodgkinson was in charge of the Company's industrial relations department which dealt with personnel matters and employee classifications. Previous to his employment by the defendant he had been in charge of the industrial relations department of the Key Highway plant of the Bethlehem Steel Company in Baltimore. He considered the position of private guard similar to that of an individual employee engaged in other departments; and that the position of corporal of the guard (although having some minor supervisory policy) was analogous to that of a "leader" in the production department, the leader being the immediate supervisor of production workers and compensated on an hourly basis. But he considered the position of sergeant analogous to that of an "assistant foreman" in the production department, the latter being the immediate superior of several leaders and compensated on a flat salary basis. The classification of employees was made by him after conferring with counsel who had given consideration to the proper application of the Act. There is no doubt that the defendant was acting in entire good faith and on a reasonable basis in the classification so made.

The contention most stressed by counsel for the plaintiff is that his activities did not meet the conditions of the definition of "executive" in that (1) he did not regularly exercise discretionary power and (2) that more than 20% of his time was spent in doing the kind of work performed by the guards. I do not find these contentions tenable under the evidence. It should seem obvious that a sergeant of the police force in discharging the duties required of him in these large plants must necessarily have exercised judgment and discretion in making arrests, in preserving order, in admonishing guards and making recommendations with respect to their activities. It is true the plaintiff himself did give some testimony to the effect that he did not consider that he had the power to discharge guards; but Mr. Hertig produced a number of written orders made by the plaintiff and other sergeants or Lieutenants for temporary suspension of guards. While the plaintiff may not have personally made many such recommendations, it is clear from Mr. Hertig's testimony that the sergeants generally did have this power subject to approval, and did exercise it, and their recommendations were generally confirmed. The plaintiff also testified that much of his work as sergeant or Lieutenant was very similar to that of the guards. Naturally enough he was unable to submit any definite factual data with respect to the percentage in time spent in these alleged nonexempt activities. I regard his testimony in this respect as a matter of opinion rather than of fact. In some sense, of course, the activities of the guards and of the sergeants were similar in nature in that both were performing police duty; but equally is it clear that the work of the sergeants and Lieutenants was essentially of a supervisory character. Of course at times they doubtless did make arrests when occasion required and the incidents occurred in their particular presence. But this was incidental to the general nature of their work as officers of the guard. The requirement of the definition that an exempt employee must not spend more than 20 per cent of his time in nonexempt activities was obviously inserted to prevent merely nominal classifications of employees for the purpose of evading the substantial requirements of the Act. I think that provision of the definition was gratified by the facts of this case.

The line of distinction between executive and administrative employees would seem to be a faint one in many situations even under the somewhat differently worded definitions made by the Administrator pursuant to the Act. In many cases a particular employee in a large industry might fairly be classified either as an executive or administrative employee. In such cases the particular adjective is hardly more than a mere choice of words. This, I think, is substantially the situation here. Perhaps

under the respective definitions of the two words made by the Administrator "executive" may be preferable to "administrative" in applicability to the instant case. But it is apparent that to some extent the two definitions are overlapping and in substance all elements of both definitions are here met. A somewhat similar situation existed in Bender v. Crucible Steel Co., D. C., 71 F.Supp. 420, infra.

There have been numerous decisions under the Act dealing with the defense of executive or administrative employees as exempt; but it will be sufficient to refer to only a few that have dealt with factual situations having some similarity to the instant case. Of these Pfoser v. Federal Cartridge Corporation, D.C.Minn., 70 F. Supp. 701, is the case most in point with respect to similarity of facts. There the employees were held exempt because employed in bona fide executive and administrative capacities. Similar conclusions in principle were reached in Bender v. Crucible Steel Co., supra, involving the steel industry; in Anderson v. Federal Cartridge Corporation, 8th Cir., 156 F.2d 681, 684; in Anderson v. Federal Cartridge Corporation, D.C.Minn., 72 F.Supp. 639 (dealing with an ammunition plant) and in Marian v. Lockheed Aircraft Corporation, D.C., 65 F.Supp. 18 (manufacture of airplanes). Counsel for the plaintiff relies particularly on two cases reaching contrary conclusions, Timberlake v. Day & Zimmerman, D.C.Iowa, 49 F.Supp. 28, and Adams v. St. Johns River Shipbuilding Co., D.C.Fla., 69 F.Supp. 989, also dealing with the classification of members of a guard department in munitions and shipbuilding plants. I have carefully considered the opinions in these cases. They are not so persuasive as those above cited. It will be noted that in both cases the point given principal consideration was the question of interstate commerce and the facts (as distinct from the conclusions) with regard to the classifications of the employees are not very fully stated.

Counsel may submit in due course appropriate orders for the dismissal of the suit as to the particular plaintiff.